**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| PETER CONDAKES COMPANY, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 09-cv-168-P-S |
| | ) |
| SANDLER BROS., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**ORDER ON MOTION FOR ATTACHMENT AND TRUSTEE PROCESS**

This dispute arises from Defendants' alleged failure to pay promptly for perishable agricultural commodities and to maintain sufficient trust assets under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a <u>et seq</u>. Before the Court is Plaintiff's Motion for Attachment and Trustee Process (Docket # 5). As explained herein, the motion is GRANTED IN PART as to Defendant Sandler Bros., Defendant Mark Sandler ("Mark"), and Defendant Candice O'Brien, and DENIED IN PART as to Defendant Marjorie Sandler ("Marjorie"). In accordance with District of Maine Local Rule 7(f), the Court determines that this matter can be decided without oral argument, and thus DENIES Plaintiff's Motion for Oral Argument (Docket # 26).

**I.  LEGAL STANDARD**

Under Maine law,[1] an order of approval of attachment or trustee process "may be entered only after notice to the defendant and hearing and upon a finding by the court that it is more likely than not that the plaintiff will recover judgment, including interest and costs," in an amount equal to or greater than the sum of the attachment plus any insurance,

---

[1] In accordance with Federal Rule of Civil Procedure 64, the Court looks to state law in adjudicating a motion for attachment or trustee process.

bond, or other security, and any property or credits attached by other writ of attachment or by trustee process shown by the defendant to be available to satisfy the judgment. Me. R. Civ. P. 4A(c), 4B(c).[2] In other words, "before an attachment may be ordered, the court must find by a preponderance of the evidence that the moving party will succeed on its claim and in an amount equal to or greater than the amount of the attachment sought." Trans Coastal Corp. v. Curtis, 622 A.2d 1186, 1188 (Me. 1993).

A motion for attachment or trustee process must be accompanied by an affidavit setting forth "specific facts sufficient to warrant the required findings and shall be upon the affiant's own knowledge, information or belief." Me. R. Civ. P. 4A(i); see also id. 4B(c). A defendant opposing attachment may also file supporting affidavits. Id. 4A(c), 4B(c), 7(c).

## II. FACTUAL BACKGROUND

### A. History and Structure of Sandler Bros.

Located in Biddeford, Maine, Sandler Bros. is a small wholesaler of fruits and vegetables subject to the provisions of PACA and the accompanying regulations promulgated by the Secretary of Agriculture.[3] Mark Sandler's grandfather and his grandfather's late cousin founded Sandler Bros. in 1929. The company eventually passed to the sons of the founders, Mark's father, Herbert Sandler ("Herbert"), and Herbert's cousin, James Sandler. Herbert and James Sandler each held 50 percent of the outstanding shares in the company.

---

[2] Notwithstanding the express hearing requirement, a formal hearing with oral argument is not necessary prior to ordering attachment. See S. Maine Props. Co., Inc. v. Johnson, 724 A.2d 1255, 1257 (Me. 1999).

[3] During the relevant period, Defendants operated under PACA license number 19741254. (See Ex. B to Aff. of Rita M. Farry (Docket # 25-7).)

Herbert ran and controlled the business and held the title of President until his death in January 2006. At that time, his share passed into his estate, where it remains. Marjorie, Herbert's widow and Mark's mother, is the personal representative of Herbert's estate, which presently holds 50 percent of the issued and outstanding shares of the company.[4] Marjorie is a resident of Longboat Key, Florida. She is not and never has been an employee, officer, or shareholder of Sandler Bros. She has never attended any meetings, conducted any business of the company, or reviewed any corporate documents. She was a director of Sandler Bros. until November 2008, when she resigned. In her capacity as director, she played no active role in the operation or management of the company. She had no responsibility for purchasing products from suppliers, handling company funds, or operating any aspect of the company.

Mark worked sporadically for the business since he was a teenager. He has never owned any shares in the company, and has focused on sales, plant operations, and personnel matters. Moreover, Mark avers that he never managed the company's financial affairs, was never given any responsibility for them, and never reviewed any company financial statements; that he never received bills or invoices from customers; and that he never wrote checks to pay any of the company's bills. That said, shortly after his father's death, Mark became President of Sandler Bros. Furthermore, he eventually became a director of the company, and is listed with PACA as a principal of Sandler Bros.; indeed, the company's State of Maine 2008 Annual Report—dated April 25, 2008, and filed by Mark in his capacity as President— lists the individual Defendants as the company's three directors. (See Ex. A to Aff. of Rita M. Farry (Docket # 25-6).)

---

[4] The Court credits Marjorie's statement over Bracey's claim, on information and belief, that Marjorie is a 50 percent shareholder of Sandler Bros.

In August or September 2006, Candice O'Brien, a non-family member who had been working for the company, purchased James Sandler's 50 percent share in the company. Prior to September 2007, an employee named Norman Petit handled all of the accounts payable and most of the accounts receivable work for Sandler Bros. At some point thereafter, O'Brien and Mark formally divided up the oversight and management responsibilities between them: Mark would maintain his existing responsibilities and O'Brien would manage the company's financial affairs.[5] Ultimately, O'Brien became a director and was given the title of Treasurer and Vice-President.

### B. Friction Between Mark Sandler and Candice O'Brien

Mark states that sometime in January or February 2009, he began to suspect that the company was in jeopardy. One of the two secretaries that worked in the office informed him on several occasions that O'Brien had discarded his mail. The secretary also told Mark that O'Brien refused to take any calls from vendors or creditors. During that time, Mark also received calls from vendors who informed him that the company was failing to make payments. Each time he received a call, he told O'Brien about it and asked that she pay the vendor; O'Brien assured him that she would do so.

At some point after Mark received these phone calls, he became aware that certain Boston vendors were requiring the company to pay for all produce in cash. Because of the secretary's report and the suppliers' calls, Mark grew very concerned about the company's solvency. Consequently, he did not draw a salary from the company in January, February, or March 2009 and took steps to investigate. By March 2009, Mark avers, it had become

---

[5] The court credits Mark's statements concerning his and O'Brien's responsibilities over Bracey's claim, upon information and belief, that Mark was responsible for the daily management and control of Sandler Bros. until approximately March 16, 2009, when O'Brien took over those functions.

4

clear that the company was in financial trouble: he had not drawn a paycheck in three months and was unable to direct O'Brien. Consequently, Mark resigned as President and director of the company on March 20, 2009. On April 6, 2009, Plaintiff received a notice from O'Brien stating that Mark had taken a position with a competitor and that Sandler Bros. continued to operate its business, despite the suspension of its PACA license.

### C. The Parties' Interaction

Plaintiff Peter Condakes Company, Inc. ("Condakes") and Sandler Bros. have had a commercial relationship since at least 2007. On or about February 27, 2007, Plaintiff's credit manager Maria Francis spoke with "Norm," whom she believed to be Mr. Petit, regarding Sandler Bros.' past due bills. (Aff. of Maria Francis (Docket # 25-4) ¶¶ 1, 5.) Petit stated that he would "voice [Plaintiff's] concerns" about missed payments to the "owner" of Sandler Bros. (Id. ¶ 5.) The account was then put on a credit watch, enabling Plaintiff to monitor the company on a weekly basis.

In March 2007, Francis expressed her concerns about the delinquency of Sandler Bros.' account to Bob Bracey, Plaintiff's Chief Financial Officer and President. Shortly thereafter, Sandler Bros. bounced some checks but replaced them with good checks after repeated calls to O'Brien, whom Francis believed to be Sandler Bros.' controller. In October 2007, Francis placed Sandler Bros. on a special pay schedule, whereby Sandler Bros. would purchase goods four to five days a week and would be required to pay an additional day's invoice until it was caught up with its outstanding balance.

Between July 15, 2008, and August 5, 2008, in the course of interstate commerce, Condakes sold and shipped produce ("Commodities") to Sandler Bros., which Sandler Bros. purchased for agreed-upon amounts at least as great as $75,000. Sandler Bros.

accepted those Commodities without objection. With each transaction, Condakes forwarded to Sandler Bros. a detailed invoice setting forth the amounts owed. Nevertheless, Sandler Bros. repeatedly failed to pay for the Commodities.

On August 4, 2008, Francis again conveyed to Bracey her concern about bounced checks received from Sandler Bros. and the company's substantial outstanding balance. On August 15, 2008, Francis had a conversation with Mark in which she explained the terms of Plaintiff's invoices to him, as well as the PACA rules, and faxed to him a statement of the account at that time. Francis found Mark to be somewhat more responsive than O'Brien and had the sense that he had greater authority; O'Brien had become increasingly difficult to contact. To the best of Francis's recollection, she spoke with Mark about the account on approximately a dozen occasions. On September 24, 2008, Francis had her last conversation with Mark, in which he stated that he would send her a bank check to cover two returned checks. That payment was never received.

On February 20, 2009, the United States Department of Agriculture, Office of the Secretary, issued a reparation award against Sandler Bros. in the amount of $76,699.75 plus $500 in costs. On or about March 22, 2009, the reparation award became final; five days later, Sandler Bros.' license under PACA was automatically suspended for failure to pay the award. To date, Sandler Bros. has paid only $1,800 of the award.

Consequently, on April 30, 2009, Plaintiff filed this suit, which seeks to recover approximately $75,000 from Sandler Bros. on various common-law and statutory grounds.[6] Moreover, Plaintiff seeks to hold the three individual Defendants jointly and

---

[6] Specifically, Plaintiff relies on theories of goods sold and delivered, breach of contract, quantum meruit, the PACA reparation award, the creation of a so-called PACA trust, breach of fiduciary duty, and violation of the PACA prompt pay requirements. (See Compl. (Docket # 1) ¶¶ 16-50.)

6

severally liable for that sum on account of their alleged breach of fiduciary duty and violation of PACA prompt pay requirements. (See Compl. (Docket # 1) ¶¶ 40-50.)

### D.     Related Litigation

On March 27, 2008, five produce wholesalers excluding Condakes filed suit against Sandler Bros., Mark, Marjorie, and O'Brien in this court seeking, inter alia, judgment in the sum of $100,756.43 on account of Sandler Bros.' failure to pay for produce.[7] This case was titled Grant Stanton Produce Co. v. Sandler Bros, Civil No. 08-99-P-S (D. Me.) ("Grant Stanton"). Mark filed an Answer to that Complaint on April 28, 2008, and Marjorie filed an Answer on June 2, 2008. Ultimately, on January 29, 2009, this Court granted a consent motion by the Grant Stanton plaintiffs, Sandler Bros., Mark, and O'Brien for entry of stipulated judgment, and granted Plaintiffs' motion to dismiss their Complaint against Marjorie without prejudice.[8]

On May 26, 2009, thirteen produce wholesalers, including four of the five Grant Stanton plaintiffs but excluding Condakes, filed a separate suit in this court against Sandler Bros., O'Brien, Mark individually and as a trustee of The Herbert A. Sandler Revocable Trust ("Herbert Trust"), Michelle L. Paulsson as a trustee of the Herbert Trust, and Marjorie as the personal representative of Herbert's estate and a trustee of the Herbert Trust, seeking, inter alia, a total of $285,496 on account of Sandler Bros.' failure to pay

---

[7] (See Compl. (Docket # 1), Grant Stanton, ¶¶ 2-11, 52-67.)

[8] (See Order on Pending Motions (Docket # 37), Grant Stanton.) Marjorie had declined to enter into a settlement agreement with the Grant Stanton plaintiffs, maintaining that she could not be held personally liable for Sandler Bros.' debt to them. (See Def. Marjorie Sandler's Opp'n to Pls.'s Mot. for Dismissal of Compl. Against Marjorie Sandler Without Prejudice (Docket # 32), Grant Stanton.)

7

produce invoices plus the outstanding balance on the judgment entered in Grant Stanton.[9] This case is titled J.J.R. Distrib. Corp., d/b/a DiSilva Fruit v. Sandler Bros., Civil No. 09-210-P-S (D. Me.) ("DiSilva Fruit").

### E. Present Status of Sandler Bros.

Due to financial hardship, Sandler Bros. recently went into receivership in Maine state court. Plaintiff's attorney Rita M. Farry has reviewed pleadings filed in the Cumberland County Superior Court, Docket No. CUM-CV-09-269, involving a complaint for dissolution brought by Marjorie against Sandler Bros., and has attended the emergency hearing in that action for the appointment of a receiver. She has been in contact with the attorney for the receiver, who opines that, given the significant PACA claims against Sandler Bros., "it is too difficult and without sufficient payoff to try to organize this in state court." (Aff. of Rita M. Farry (Docket # 25-5) ¶ 4.) Other filings in this case indicate that the appointed receiver for Sandler Bros., Windsor Associates, LLC, has since filed its notice of resignation. (See Mot. to Withdraw (Docket # 27) at 2.)

According to Farry's review of the state pleadings, Sandler Bros.' present assets consist of a 2003 GMC Savannah truck; a Freightliner FL70 truck; real estate, fixtures, and machinery located at Main Street, Biddeford, all subject to a bank lien; approximately $5,000 in receivables collected, with another $60,000 in apparent receivables; and a potential claim against Maine Native Produce, in an indeterminate amount, for misappropriation of Sandler Bros.' customers. (See Aff. of Rita M. Farry (Docket # 25-5) ¶ 5.) Farry further states, upon information and belief, that "the PACA claimants have a claim against the Saco/Biddeford Savings Bank and perhaps additional third parties, for

---

[9] (See Compl. (Docket # 1), DiSilva Fruit, ¶¶ 3-22, 98-114.) The DiSilva plaintiffs have filed motions to consolidate the instant action with DiSilva Fruit. (See Mot. to Consolidate (Docket # 29); Mot. to Consolidate (Docket # 19), DiSilva Fruit.)

payments improperly made by Sandler [Bros.] from the PACA trust funds, but it is likely that the pro rata net recovery of funds by PACA claimants, after costs and attorneys' fees, will be negligible." (Id. ¶ 6.)

### III. DISCUSSION

"Enacted in 1930, PACA had the intent of preventing unfair business practices and promoting financial responsibility in the fresh fruit and produce industry." Sunkist Growers, Inc. v. Fisher, 104 F.3d 280, 282 (9th Cir. 1997) (citation and internal punctuation omitted). "In addition to protecting consumers, Congress expressly designed [PACA] to protect the producers of perishable agricultural products, most of whom must entrust their products to a buyer who may be thousands of miles away, and depend for their payment upon his business acumen and fair dealing." Weis-Buy Servs., Inc. v. Paglia, 411 F.3d 415, 421 (3d Cir. 2005) (citation and internal punctuation omitted). As the First Circuit explained:

> In 1984, Congress amended PACA by creating a statutory trust over any goods, receivables, or proceeds from perishable agricultural commodities until the buyer makes full payment. The commodities, receivables, or proceeds [must] be held by such commission merchant, dealer or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities . . . until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents. In essence, PACA creates a trust in favor of the seller of the unpaid goods which is superior to the interest of the buyer's secured lender. One result is that the *res* of the trust is subject to the seller's lien and never becomes part of the buyer's estate in the event of the buyer's bankruptcy.

Hiller Cranberry Prods., Inc. v. Koplovsky, 165 F.3d 1, 4-5 (1st Cir. 1999) (citations and internal punctuation omitted). Moreover, "[a]n individual who is in the position to control the trust assets and who does not preserve them for the beneficiaries has breached a fiduciary duty" and may be held personally liable for that breach, assuming that corporate

9

assets are insufficient to satisfy PACA liability. Id. at 8-9; see also Sunkist Growers, 104 F.3d at 282-83; Weis-Buy Servs., 411 F.3d at 420-22; In re Ozcelik, 267 B.R. 485, 490 (Bankr. D. Mass. 2001); Morris Okun, Inc. v. Harry Zimmerman, Inc., 814 F. Supp. 346, 348 (S.D.N.Y. 1993). "Personal liability under PACA requires only that trust assets be used for some purpose other than repayment to the seller. This includes use of the proceeds from the sale of perishables for legitimate business expenditures, such as the payment of rent, payroll, or utilities." Ozcelik, 267 B.R. at 490-91 (citations and internal punctuation omitted).

In sum, "a PACA trust in effect imposes liability on a trustee, whether a corporation or a controlling person of that corporation, who uses the trust assets for any purpose other than repayment of the supplier." Hiller Cranberry Prods., 165 F.3d at 9. Mindful of the First Circuit's admonition that PACA, "a remedial statute[,] should be given a liberal construction in favor of promoting Congress' intended purpose," id. at 6, the Court now turns to the potential liability of all four Defendants.

### A. Sandler Bros.

Sandler Bros. has not opposed Plaintiff's requested entry of attachment and trustee process. In any event, the Court concludes that it is more likely than not that Plaintiff will recover judgment in the amount sought to be attached against Sandler Bros.[10] Plaintiff has adduced uncontested evidence that it sold and shipped Commodities to Sandler Bros., for which the latter agreed to pay at least $75,000; that the Commodities were accepted without objection; that a detailed invoice accompanied each transaction; that Sandler Bros.

---

[10] The Court observes that none of the Defendants has shown that there is any insurance, bond, or other security, or any property or credits attached by other writ of attachment or by trustee process, available to satisfy any judgment against one or more of them in this case.

10

has repeatedly failed to pay for the Commodities; that the USDA issued a final reparation award against Sandler Bros. in the amount of $76,699.75 plus $500 in costs;[11] and that Sandler Bros.' PACA license has been automatically suspended for failure to pay the award in full.

Accordingly, entry of the requested order of attachment and trustee process against Sandler Bros. is appropriate.

### B. Candice O'Brien

O'Brien has also not opposed Plaintiff's requested entry of attachment and trustee process.[12] In any event, the Court concludes that it is more likely than not that Plaintiff will prevail in its effort to hold O'Brien jointly and severally liable for the outstanding debt. First, the record evidence indicates that the corporate assets of Sandler Bros. likely are insufficient to satisfy the company's PACA liability, thus triggering the secondary liability of those who had a role in causing the company to commit its breach of trust. See Ozcelik, 267 B.R. at 490. Moreover, O'Brien qualifies as a person who was in a position to control the PACA trust assets: she served at relevant times as Sandler Bros.' director, Treasurer, and Vice-President, held 50 percent of the company's shares, and assumed explicit responsibility for the company's finances. See id.; see also Grimmway Enters., Inc. v. PIC Fresh Global, Inc., 548 F. Supp.2d 840, 850 (E.D. Cal. 2008). Finally, O'Brien, who was responsible for the company's payment of bills and who dealt with

---

[11] The reparation award is prima facie evidence of the debt owed by Sandler Bros. See 7 U.S.C. § 499g(b).

[12] On June 5, 2009, in light of O'Brien's failure to file an answer or responsive pleading, the Clerk's Office granted Plaintiff's Motion for Entry of Default against her. (See Docket #s 22 & 23.) On June 22, 2009, Plaintiff filed a Motion for Default Judgment against O'Brien. (See Docket # 30.) The following day, O'Brien filed a motion to set aside the entry of default. (See Docket # 31.)

11

Francis, played a role in the breach of trust by diverting trust assets to some purpose other than payment. See Ozcelik, 267 B.R. at 490-91.

Accordingly, entry of the requested order of attachment and trustee process against O'Brien is appropriate.

### C. Mark Sandler

Mark contests the entry of an order of attachment and trustee process against him on two principal grounds: first, that he was not a trustee of the PACA trust arising in favor of Plaintiff because he was not in a position to control the trust assets and did not play a role in causing Sandler Bros. to breach the trust, and, second, that he did not breach his fiduciary duties.[13]

"A court considering the liability of the individual may look at the closely-held nature of the corporation, the individual's active management role and any evidence of the individual's acting for the corporation." Produce Alliance, L.L.C. v. Green Apple Produce, Inc., No. Civ. 04-278-S-EJL, 2005 WL 1153616, at *4 (D. Idaho May 16, 2005) (citation and internal punctuation omitted). While Mark did not at any time own Sandler Bros.' stock, he acted as the company's President and one of its directors. He was also listed with PACA as one of the company's principals. In addition, although Mark and O'Brien arrived at an explicit division of duties pursuant to which O'Brien was primarily responsible for financial management, Mark himself admits that as the company's finances deteriorated, he began to field calls from suppliers and attempted to control O'Brien.

Mark indicates that this intervention occurred in early 2009, after he began to suspect that the company was in jeopardy. Nevertheless, one could reasonably conclude

---

[13] Mark and Marjorie also contend that Plaintiff has failed to demonstrate that Sandler Bros.' assets were insufficient to meet its PACA liability. In fact, the affidavit of Plaintiff's attorney Rita Farry contains evidence of such insufficiency. (See Aff. of Rita M. Farry (Docket # 25-5) ¶ 5.)

12

that, well before January 2009, Mark knew or should have known that the company was in jeopardy and had become personally involved in Plaintiff's demands for payment. This evidence includes the filing in March 2008 of the Grant Stanton litigation for non-payment of invoices, and Francis's averments that she spoke with Mark on about a dozen occasions in August and September 2008 regarding Sandler Bros.' nonpayment.

In sum, the Court concludes that Mark's status as Sandler Bros.' President and one of its directors and principals, together with his active involvement in the day-to-day management of its affairs, including its financial affairs, suffice to establish that it is more likely than not that he was in a position to control the trust assets during the relevant period. See, e.g., id., at *7 ("The test is not whether some other officer or director was more actively involved in the day to day operations and control of the trust assets, the test is whether [defendant] was in a position to control trust assets as President of a highly regulated produce business."). And because an individual's failure to ensure the preservation of trust assets constitutes a breach of fiduciary duty[14]—in other words, active dissipation of assets is not required—the Court concludes that it is more likely than not that Mark played a role in the breach of the PACA trust arising in favor of Plaintiff.

Even if he is found to be a trustee, Mark maintains that he did not breach his fiduciary duties because he exercised reasonable care, skill, and caution.[15] Specifically, once he began receiving reports from office assistants and phone calls from vendors, Mark contends that he took immediate action, no longer taking a paycheck, making inquiries of

---

[14] See Golman-Hayden Co., Inc. v. Fresh Source Produce Inc., 217 F.3d 348, 351 (5th Cir. 2000); Dayoub Mktg., Inc. v. S.K. Produce Corp., No. 04 Civ. 3125(WHP), 2005 WL 3006032, at *3 (S.D.N.Y. Nov. 9, 2005); Movsovitz & Sons of Florida, Inc. v. Axel Gonzalez, Inc., 367 F. Supp.2d 207, 214 (D.P.R. 2005).

[15] See Weis-Buy, 411 F.3d at 421 ("Under the common law, the trustee of a trust is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property.") (citation omitted).

O'Brien, and obtaining her assurances that she would promptly pay vendors. Yet, as noted above, Plaintiff has adduced evidence from which one could reasonably conclude that Mark was or should have been aware of Sandler Bros.' non-payment prior to July 2008, and that he began dealing directly with Plaintiff regarding its particular complaints as early as August 2008, several months before he claims to have taken adequate remedial action.

Accordingly, entry of the requested order of attachment and trustee process against Mark Sandler is appropriate.

### D. Marjorie Sandler

The question of Marjorie's personal liability is more difficult. On the one hand, she is not and never has been an employee, officer, or individual shareholder of Sandler Bros. She was placed on the board of directors by her late husband but played no active role in the company's operation or management. She never attended any meetings or conducted any business of the company. She had no responsibility for purchasing products from suppliers, handling company funds, or operating any aspect of the company. Indeed, although Herbert ran the company for decades, Marjorie rarely even set foot inside the company doors. She resigned her directorship in November 2008.

On the other hand, Marjorie was among the defendants named in the Grant Stanton Complaint, to which she filed an Answer in June 2008. Moreover, she wrote a letter to O'Brien dated April 1, 2009, in which she stated that she had made specific inquiries regarding the company's finances the prior summer that had not been addressed.[16] At that

---

[16] "As you are aware, I have no involvement with Sandler Bros. and have relied heavily on your input over the years regarding the financial condition of the business. Last summer I made specific inquir[i]es regarding finances that were not addressed. I feel as if I have not gotten straight answers from you for many months. This, coupled with your tone during our call on Sunday, has left me no choice but to specifically request that you provide me with a complete accounting of the finances of Sandler Bros. I also request that you provide me, immediately, a copy of all account statements and any documentation demonstrating your handling of finances (for example, the company's operating account statement which is easily obtainable online). . . .

14

time, evidently in her role as personal representative of her late husband's estate, she threatened to call a special meeting if necessary. Finally, Marjorie later filed a petition for dissolution of the corporation.

Of course, individuals are "not secondarily liable merely because they served as corporate officers or shareholders. . . . [T]here may be many small corporations in which an individual may hold corporate office or shares, for entirely legitimate purposes, and not exercise any day-to-day control over the company's affairs." Shepard v. K.B. Fruit & Vegetable, Inc., 868 F. Supp. 703, 706 (E.D. Pa. 1994); see also Paris Foods Corp. v. Foresite Foods, Inc., No. 1:05-cv-610-WSD, 2007 WL 568841, at *8 n.3 (N.D. Ga. Feb. 20, 2007), aff'd, 278 Fed. Appx. 873 (11th Cir. 2008) (rejecting the concept of "strict liability" for shareholders "without regard to whether they actually were in a position to control the PACA assets"); Mid-Valley Produce Corp. v. 4-XXX Produce Corp., 819 F. Supp. 209, 213 (E.D.N.Y. 1993) ("Indeed, this Court believes that there are many small corporations in which an individual may own 100% of the stock and yet choose—for entirely legitimate purposes—not to exercise any day-to-day control over the company's affairs."). Marjorie presents herself as "the very type of individual discussed in Shepard who should *not* be held personally liable to PACA beneficiaries—the spouse of the founding shareholder, who is given a title but never called upon to exercise any oversight, or to control or participate in the day-to-day operations of the company."[17]

---

Please let me know by tomorrow if you intend to take immediate action and provide me with a complete financial breakdown of Sandler Bros., including the account activity summary documents. If you do not intend to do so, regrettably, we will have to address this through a Special Meeting and more delay will result."

(Ex. A to Pl.'s Reply to Resp. to Mot. for Attachment & Trustee Process (Docket # 25-2).)

[17] (Mark and Marjorie Sandler's Obj. to Pl.'s Mot. for Attachment and Trustee Process (Docket # 20) at 8 (emphasis in original).)

Condakes argues that the Court should not indulge Marjorie's professed ignorance of her responsibilities in light of the Grant Stanton litigation, which served as "an urgent reminder" of those responsibilities. Moreover, it observes that in her letter to O'Brien, Marjorie referenced inquiries that she had made to O'Brien regarding Sandler Bros.' finances in the summer of 2008, and threatened to call a special meeting. This document testifies, Plaintiff maintains, to Marjorie's authority and control over Sandler Bros.

On the record evidence presently available, the Court concludes that Marjorie has the better of the argument. It appears that Marjorie was a generally passive director: she attended no meetings, had no day-to-day involvement, and rarely visited the corporate headquarters. When her husband died, she became personal representative of his estate, which held 50 percent of the corporation's shares. Sole ownership of a corporation may, in some circumstances, place an individual in a "position to control" PACA trust assets;[18] however, the estate's 50 percent ownership stake will not, without more, suffice to expose Marjorie to personal liability as a PACA trustee.[19]

The Grant Stanton litigation and April 2009 correspondence do not provide this necessary additional evidence of Marjorie's ability to control the trust assets. First, the Grant Stanton litigation did not significantly alter Marjorie's relationship with the company; indeed, she maintained in that litigation that her connection to Sandler Bros.'

---

[18] See, e.g., Golman-Hayden, 217 F.3d at 351; Dayoub, 2005 WL 3006032, at *3; but see Mid-Valley Produce Corp., 819 F. Supp. at 212-13 (declining to hold corporation's sole stockholder liable as PACA trustee).

[19] Presumably, Marjorie resorted to filing a motion to dissolve the corporation precisely because the estate did not have a controlling stake and was deadlocked with the other 50 percent shareholder, O'Brien.

business dealings was too attenuated to subject her to personal liability.[20] Moreover, Marjorie's correspondence with O'Brien apparently went unanswered, and does not, in any event, rise to the level of active involvement that courts have found necessary to create personal liability. See, e.g., Grimmway, 548 F. Supp.2d at 849-50; Produce Alliance, L.L.C., 2005 WL 1153616, at *6; Shepard, 868 F. Supp. at 706.

In sum, Condakes has not shown that it is more likely than not that Marjorie possessed sufficient control of the trust assets so as to expose her to personal liability.

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS that Plaintiff's Motion for Attachment and Trustee Process (Docket # 5) is hereby GRANTED IN PART as to Defendants Sandler Bros., Mark Sandler, and Candice O'Brien, and DENIED IN PART as to Defendant Marjorie Sandler.

It is further ORDERED that attachment on trustee process be made against the property and credits of Defendant Sandler Bros., Defendant Mark Sandler, and Defendant Candice O'Brien, in the amount of Seventy-Five Thousand and 00/100 Dollars ($75,000.00).

SO ORDERED.

    /s/ George Z. Singal  
    United States District Judge

Dated this 16th day of July, 2009.

---

[20] (See Def. Marjorie Sandler's Opp'n to Pls.'s Mot. for Dismissal of Compl. Against Marjorie Sandler Without Prejudice (Docket # 32), Grant Stanton.)